Thank you for the opportunity. All right, final case of the day, Thomas Wilson and Randy Brown v. Warren County, Illinois. Mr. Kelly. May it please the court. I'm Mark Kelly. I'm Tom Wilson, your Randy Brown's lawyer. And I want to say at the outset, this isn't a case that involved a gentleman who's seeking a remedy for a harm to his dignity, although that was certainly the case. This is a man whose life was destroyed, driven from his home, all his valuable property seized, under the watchful eye of the Warren County Sheriff, after consultation with the Warren County State's Attorney, in a raid that took all day, without a court order, after he demanded to see a court order. So that's the only facts that I'll go over, unless they're relevant to the points I'm going to make, but I'm going to go first into the Fair Housing claim. It was dismissed in the lower court, and I can't raise that in state court if I lose this appeal. So I have to make sure I reach it. So on the FHA claim, although Hanson knew about Wilson's disability, isn't it a little strange to say he was acting because of that disability? In other words, doesn't it seem that in light of the business fallout, among other things, Hanson would have done the same thing, regardless of his disability? He wouldn't have done it in the same way, because my whole point, and I don't think the district court necessarily shot this down, is that the choice of methods mattered. There's many ways to discriminate against somebody that would all fall into the same types of discrimination that racial and ethnic and religious discrimination falls into, where you have an animus. A lot of times discrimination can occur against families or the disabled that really is kind of innocently motivated. In this case, we don't believe it's innocently motivated, but the fact is that the methods that were chosen were geared towards exploiting Mr. Wilson's handicap in a most despicable way, to cause him physical disability under a known method that they had actually observed the previous Tuesday. They had a dry run at it, and then Mr. Johnson came into the premises on Saturday and intentionally sought, we think a jury could find, that we are going to take the wind out of Mr. Wilson's sails by putting him under this stress. That Mr. Johnson, a criminal defense attorney by the way, we think tailored towards what he learned, what Mr. Hanson had told him about Mr. Wilson, what Mr. Reiners had told him about Mr. Wilson based on the Tuesday incident, and what he observed himself on Tuesday. That that conduct of entering onto his property, past the no trespassing sign, into Mr. Wilson's house, following around, threatening that he would be arrested, and again, all without a court order, all without any real theory that this residence that he was entering wasn't even owned by his client, and knowing what the outcome of that would be is in effect driving him from his house. That was their objective. They wanted that property back under this void deed theory. But what's the best evidence of a conspiracy with Deputy Carithers? He was only working that day because somebody called in sick. Right. He didn't order any property to be removed. Well, we're not actually, we're not seeking the fair housing damages or the liability against the county. That was really just a claim we're making against the private defendants, but it has been dismissed. So the county is out now. Yes, we never really alleged or sought to affect. I don't think they even answered those claims, if I'm not mistaken. So that's my, the point that I would like to make about the fair housing. I have, the analogy is that, well, it's just that the method that you choose can show that you are discriminating because of, you're taking action because of someone's disability. I want to move on to the 1983 cases. And then first, addressing the conspiracy issue. And to tell you that there really is no overt conspiracy here. That that was a thread we pulled in our initial pleading and then through discovery because of just an incredible string of coincidences. The county wanted the property to be cleared. The county issued this junk and debris letter for an ordinance violation, but didn't even give it to the right parties. Mr. Johnson uses that junk and debris letter as the lynchpin of his attempt to basically seize all this property. He has numerous contacts with Algren, with the state's attorney, Albert Algren, and then has interaction with Carithers multiple times from Tuesday through Saturday. And then Mr. Wilson objects. Carithers gives him, or the state's attorney Algren gives him this reassurance that this raid won't occur without a court order, won't be repeated without a court order. And then the very Saturday when it happens, his worst fears are realized. Mr. Johnson is saying, I just talked to the state's attorney, here's his cell phone number, and voila, the raid just occurs anyway, again, without a court order, without any... Don't you have to show that these state actors had this bad motive like Johnson did? In order to show this conspiracy, don't you have to show that the state knew what was going on and was part of it? I don't think so, because number one, we're not alleging an overt conspiracy. But in all the repossession cases, so many of them don't ever talk about a meeting of the minds and don't show that the parties got together and said, gee, we're acting improperly here, let's go for it. It just doesn't happen. Like I said, in the repossession cases, that's rarely ever discussed. Even in one of the cases, the Booker v. City of Atlanta, they said that this discrimination, this state action can be intentional. In this case, what we have, though, is willful blindness. I think it's a well-established law that if you know something might happen, and you close your eyes to it, possibility of it happening, make no investigation, it's the same as choosing it. And that really is the case here. That's the thread we pulled about conspiracy. It didn't pan out. What we got was something, I think, even harder to believe. But even the repossession cases, don't they say that just the fact that law enforcement is there, that doesn't transform a private act into a public act? Exactly. But in this case, Deputy Crithers and Attorney Algren did so much more. But did either of them actually know that he didn't have a court order? And they might have been kind of negligent. I'm not disputing that these guys were not at the top of law enforcement's game, but is there any evidence that they knew that Johnson didn't have a court order? Or Johnson, that they knew that there was a court order? How do we know? I mean, from what I see, they might not have known. But what they did, though, Your Honor, was— If they didn't know, isn't that doom your case? I don't think so. Because in this case, what they did was they were on notice since Tuesday. Tuesday, Wednesday, Friday, Saturday. On notice of what? That Mr. Wilson feared these people were coming onto his property without a court order. And Mr. Algren, Deputy State's Attorney Algren, said, Court order is needed for this raid. Sorry. Call the sheriff if you think there is one. And then he gets that very call, and he says, No, I'm not going to ask my deputy to look for an order. I'm just going to trust Johnson without any investigation. What was so hard with show me the order? So, but that's negligence. Well, I think that is— That's negligence. Well, to me, it's willful blindness to my client that when you know that it's going to happen, and you willfully close your eyes and say, We will trust Mr. Johnson. What other area of law does the state get to say, I'll rely on this informant for probable cause warrant without investigating, or I'll look at—I'll serve this search warrant without reading it. That's essentially what they did here. So I think the willful blindness, it's a well-established principle that it's the same as choosing the conduct that you're willfully blind to. So I don't think it's negligence. I don't think they made a bad judgment call. They weren't careful enough. They didn't try at all. I think that is the difference here. But this Cunningham case says there's a requirement for joint action is that the parties share a common unconstitutional goal. So can you go that far with these statements? Well, I can't because, like I said, we can't show that there was a meeting of the minds, except that I confess that I'm not familiar with the facts of the Cunningham case off the top of my head, and so can't compare it, except that this was just in reading the repossession cases. They never even seemed to discuss that. So, yes, there is no conspiracy, yes. Our case depends on if you think that the Warren County state's attorney can turn over the authority of the state to a private attorney from out of town. In the face of this history of having done this dry run raid on Tuesday, having Mr. Wilson and Mr. Gulseth on his behalf call the state's attorney and get reassurances that this won't happen again, call the sheriff, and then Mr. Wilson calling the sheriff and then having the sheriff show up and get the situation laid out for him and then still not bothering to say, have him show you the order. Four words. And then the normal policy of the state's attorney would be, there's no order, parties go to court to get an order. The normal policy is if the order is unclear, we'll bring it in, we'll put everything to a halt, and we'll go and look at it. Plus, again, Deputy Carithers threatened Mr. Wilson. Mr. Wilson then reported this threat to other people contemporaneously who then withheld their attempts to help him. Randy Brown would have disabled the Pink Baker forklift. Dennis Gulseth would have talked to Carithers and maybe gotten through his sense. And I can't see if these lights are on, but I hope they're not. So the state did more than just sort of sit by and fail to assist, although then again their failure to assist was culpable too because the state's attorney had Mr. Wilson, according to his affidavit, in his office and talked to him after he had talked to Dennis Gulseth about call the sheriff if they come back and we'll make sure they have an order. Not exactly his words, but Mr. Wilson then, who had been keeping his gate chained and locked, got up Saturday morning and didn't think he needed to do that and up walks Mr. Johnson and the crew onto his premises. So Mr. Augering, we think, he reasonably relied on his promise, increased his vulnerability, and Mr. Johnson took advantage of it. Then when he got the call, I think he had the duty to basically say, all right, we better inquire into this. We have the affirmative duty then to say, this is exactly what I've talked about the day before with Mr. Gulseth at length and with Mr. Wilson, that this is a raid without a court order. I better check to see that there is one. That's exactly what they were, what he feared. So it's not like he was. You know you're under your rebuttal. Okay. Then I will then conclude that and pick this up. Thank you. All right. Mr. Radian? Did I say that correctly? Yes. All right. Good morning, Your Honors. May it please the Court, I'm here on behalf of Warren County State's Attorney Albert Augerin and Warren County. As Judge Williams, you pointed out, we believe that at most what plaintiffs have in terms of evidence, at most it can show negligence on part of the State's Attorney. Sure, he should have been more careful and he should have exercised more due care in handling the phone call that he received from the deputy that day. But if we look at all the cases that this court has decided under the substantive due process theory or the claim, it requires a much more culpable conduct on the part of the public official before the court finds liability. The standard is variously described as shocks the conscience or deliberate indifference or recklessness. And under the recklessness standard, you need to either know that what you're going to do has a risk of causing harm to the citizen or it should be obvious, plainly obvious. And here we have basically two bases, two things that the State's Attorney is alleged to have done or not done. The first was a phone call that Mr. Wilson's friend made to the State's Attorney. This was on Friday of the week in question and it was three days after the private defendants had visited Wilson's property. They'd begun scouting it out. They took photographs and on Thursday they had already planned that they were going to go to Wilson's land on Saturday and remove items of property that they believed belonged to them. So the decision to go to the property to remove Wilson's items had already been taken on Thursday. On Friday, the State's Attorney gets a call complaining that they had come and done this. The State's Attorney says, no one can come on your land and remove items of property without a court order. As the District Court correctly characterized this statement, it's a general principle of law. Now, there is absolutely no evidence in the record that the State's Attorney communicated anything to the private defendants or their attorney. There is no evidence that the private defendants even knew that there was any communication between Wilson and the State's Attorney. So if we look at whether the plaintiff was safe before Algren spoke to him on Friday and whether he was unsafe afterwards, we find that the record only supports one conclusion, which is that Wilson already faced danger to his property from the private defendants. Nothing that Algren said had any bearing on whether the private defendants were more likely to go that Saturday, less likely to go that Saturday. Now, the plaintiff mentioned in his reply brief and alluded to it this morning that because of what Algren told him, he unlocked his gate, which was usually locked. Our position is that, number one, that is an unreasonable step to take based on what the State's Attorney told him. The State's Attorney, mind you, did not explicitly tell Wilson to do that, meaning to seize any protective measures that he could himself have taken. And so it's odd that instead of doubling up on your own protective measures, you would somehow construe that statement to mean that I should seize my own protective measures. Second problem with that theory that plaintiff espouses is it's not like he asked the State's Attorney or told the State's Attorney, hey, based on what you're telling me, I'm going to seize my protective measures, I'm going to leave my gate unlocked. So that on Saturday, when the State's Attorney got the call from the deputy, he didn't even know that Wilson had left his gate unlocked, let alone that the private defendants had been told by the State's Attorney. They didn't know either. Now, as we've seen in the record, the private defendant's attorney, Johnson, testified in his deposition that the absence of a court order didn't really deter him from counseling his own client that he had a right to go there on Saturday and remove items of property. We have to keep in mind that the private defendant, one of them, owned one of those pieces of property, the 411 Railroad Street property. The 357 property had been deeded by them to Mr. Wilson. So as far as their attorney was concerned, you're the owner, you have a right to be there. So that is the first thing that plaintiff complains about the State's Attorney, the so-called promise or assurance that he would take care of things when they called. And under the exception to the DeShaney rule that they're making this theory, they really don't have the evidence to show, as this court asks, that an affirmative act of the public official increased the danger that you faced. It's not enough just to show a causal connection between whatever the State's Attorney said and the injury. They don't have that. Now the second, and if they don't have that, then our position is that as a public official, receiving a phone call who's not even present at the scene of the seizure between two private parties, well then that public official doesn't have a duty to start with under DeShaney. So now anything that he did or didn't do that they complain about, even if it's negligent, he didn't even have a duty to protect them from private defendants' designs on their property. Now another thing to keep in mind about the seizure claim is that the State's Attorney not being there is limited to knowledge of the situation based on whatever he's hearing from the deputy. So he doesn't know. And one last point I want to make before I yield to my colleague is that when the deputy called the State's Attorney, he clearly tells the State's Attorney, the private defendants are on the property and they've begun removing items. So the seizure had already begun and the State's Attorney didn't really have a duty, and even if he did, at most he should have been more careful. He certainly wasn't reckless and it wasn't obvious that it would result in the injuries that plaintiffs suffered. Thank you, Mr. Ratti. Thank you. Mr. Elward? Anything else to add? Thank you. Just a couple of brief comments. First, my opening comment is going to relate to a few words that my opponent has used in his description of the activities of the defendants. He keeps referring to they, basically trying to lump my client and the State's Attorney together with respect to what happened on the 22nd and on the 25th. Who is your client? My client is Mr. Carithers, Your Honor. I think the important thing here is my client did not have any knowledge of the conversations that are alleged to have taken place between Mr. Wilson and the State's Attorney on the 25th, which was on the Friday. Do you know why the private defendants didn't bother to file anything? Pardon me? Do you know why the private defendants didn't bother to file anything? No, Your Honor, I do not. I do not. My point, Your Honor, is this. My client, Mr. Carithers' activities and contact in this case, that their purporting gives rise to any concept of a conspiracy are centered solely on the activities that took place on the 26th, which was the Saturday when Hanson and Johnson and their crews came out to do the removals. I think what's important here is that this Court remember that when we're looking at whether or not there was a willful attempt to conspire or engage in these concerted efforts by the private defendants, by Mr. Carithers, the officer, I think it's important to take a look at what the officer knew at the time. Mr. Carithers had been out to the property in 2008 responding to an open door. And when he called the station and said, you need to send the owner out, who'd they send out? They sent out Mr. Hanson. He comes out to the property in 2008 and walks through with Deputy Carithers. So at that point, Deputy Carithers thinks, well, here's the property owner has been called to the property. He must be the property owner. But it goes beyond that. On Tuesday, the 22nd, Officer Carithers is out at the property. He's responding to a call that takes place. And after Mr. Wilson had his incident, his seizure, and was taken away, he's talking to Johnson and Hanson on the property. He says, what are you doing here? Well, we're out here. We got this cyst order, this junk order. We're going to be removing this junk, so we're out here taking pictures of the things that we're going to remove. So again, we have another incident where Deputy Carithers believes that Hanson is rightfully on the property and the rightful owner of the property. But it goes further than that. When Mr. Carithers, when Officer Carithers comes into work on Saturday morning, again, this is supposed to be his day off, he comes in on Saturday and he's told by the police headquarters, we're going to get a standby call. The owners are going to be doing some removal work. We want you to stand by and do a peacekeeping job on the premises. So he has that knowledge. He goes to the premises. As soon as he gets out of his car, after he gets the standby call, as soon as he gets out of his car, he's approached by Johnson, who's holding up a stack of papers and sticks them in his face. And what Mr. Johnson says to him is, here's our court papers, my client has a right to be here. Well, as my co-counsel said, Mr. Johnson testified in his deposition that he had consulted with his client, Mr. Hanson. Couldn't your client have taken a look at what the papers said? Well, that's one of the questions here that counsel raises as a point. He says, my client should have reviewed these papers. Well, my client did look at these papers, and he didn't know what they meant. He didn't know the implications of these papers. And so he called the state's attorney. Why were they so complicated that he couldn't tell? He had no experience with those, Your Honor. He had never seen anything like this before, and he didn't know what the implications were. And so he called the state's attorney pursuant to the policies, and he said, I've got these papers, we have people out here, they're starting to remove property, and they're telling me that they've got a right to be here, and I've got these court papers. And so there's that discussion that is brought out in the record about the effect of these court papers. And when my client Carrillo hung up that call, he testified that he believed that the state's attorney had told him that that gave the right of Hanson & Johnson to be on the premises. So my point in going through all this is to simply say this. If the state of mind is important for the concept of what's willful, whether there's a willful joinder by my client in this conspiracy by the private defendants, then we have to look at what his state of mind was, and was he acting willfully and intentionally, or was he negligent at most? And everything that my client had in front of him at that time said that Hanson was the owner of that property and as a property owner had a right to be there, including his attorney, Johnson, who was standing there saying, my client has a right to be here. Should he have read the papers? Perhaps he should have. But he's already told us clearly, I didn't know what they meant. And when he came away from that phone conversation with the state's attorney, it was his impression that Hanson & Johnson and their crew had a right to be there. Now, right or wrong, I think the point is that's what his belief was and that shows there was no intent. Now, the last thing I'd like to point out is my client, the opposing counsel has talked about other activities that Carithers participated in. He referenced something he refers to as a threat, and in the brief he implies that my client gave permission for Johnson and his crew to take activities, to commence their activities on the premises. I would point out this. Remember, Officer Carithers was called to the property in order to be a peacekeeper, to be a standby officer and basically preserve the peace. Once it was decided, right or wrong, whether or not Hanson had a right to undertake those activities, Carithers was performing that job. And when someone says, I want to stop that forklift, I'm going to stop this activity, and he says, no, you're not, and you're going to behave, or even if you assume that they're correct and he says, I'm going to arrest you, all my client Carithers was doing at that time was enforcing the peace as an officer of the peace, as an officer who was called as a standby officer. So whether or not he nodded at Johnson, whether or not he directed people to Johnson is irrelevant because it's after the fact. Thank you very much. Thank you. Any time left? Three minutes. Thank you. I'll respond to Mr. Radia's arguments first. Recklessness means you have to act when you know the risk, is what Mr. Radia said. And after the meetings with Dennis Gulseth and Tom Wilson, or the phone call with Dennis Gulseth and Tom Wilson on the 25th, a state's attorney knew the risks, that this was an invasion onto someone's residence, onto property that Dennis Gulseth was the deeded owner to, that Mr. Wilson lived at, that was accomplished the Tuesday before without a court order and that was feared to be repeated. So when he got the call on Saturday, had he forgotten the conversations and meeting the previous day? He certainly knew the risk at that time. So that takes it out of mere negligence, puts it into recklessness, and frankly, given the harm Mr. Wilson suffered, puts it into outrageousness. And he didn't just hear from Mr. Gulseth that this popped up on the day before. Mr. Gulseth, the record shows, had tried to call him the previous Wednesday, the day after this happened. Mr. Algren apparently chewed over the phone message, wondering whether Mr. Gulseth was an attorney or whatever, and never got back to him until Mr. Gulseth then recalled him on Friday and finally reached him. Now, whether Mr. Wilson was not safe before the call to state's attorney Algren? Well, with the gate locked, that makes a lot of difference. With the gate locked, the private defendants don't present a fait accompli to Deputy Carithers when he arrives. They're not milling about the premises and having begun their harassment. The Monfils case does say that it's not required that the state cut off avenues of protection. It's not something that the defendant doesn't have to basically show that there's nothing he could have done but for the state's conduct. If the state increased or created a danger, then that's enough. They don't have to create all the danger or be the sole cause of the danger. Now, Mr. Johnson saying he would have gone forward anyway is a self-serving statement under leading question in his deposition testimony, but it's totally belied by the facts. He did actually seek a court order, Your Honor. They actually filed a case, and he tried to get a temporary restraining order on Friday, but there were no judges in the courthouse. He just decided, well, I'm going to go ahead anyway. Do you know why Johnson didn't file anything here? Oh, why here? Yes, he's been disbarred for a year based on these allegations, and I think he's always ridden on the coattails of the convoy. Based on this case, he's been disbarred? Yes, Your Honor. Mr. Wilson pursued an ARDC complaint against him. Well, he's appealing that to the Supreme Court, which is why I couldn't bring that to your attention. It's not final. So if you ask the question, that's my response to it. All right. Thank you, Mr. Kelly. Time is up. Okay. Thank you.